UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

| | | |
|---|---|---|
| VIRGIL R. GREEN, # 189440, | ) | |
| a/k/a Mu'eem A. Rashad | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:08-cv-51 |
| | ) | |
| v. | ) | Honorable Janet T. Neff |
| | ) | |
| GAIL TUDOR, et al., | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff is an inmate at the Muskegon Correctional Facility (MCF). He named four State of Michigan employees as defendants: (1) former Assistant Librarian, Gail Tudor;[1] (2) School Principal, Michael Barnett; (3) Assistant Food Service Director, Ron Almy; and (4) Warden's Administrative Assistant, Delores Crosby.

Plaintiff's claims against defendant Tudor stem from plaintiff's June 4, 2007 use of MCF's law library. He alleges that defendant Tudor violated his First Amendment right of access to the courts and violated his rights under the Fourteenth Amendment's Equal Protection Clause when she sent plaintiff to the back of a short line of prisoners waiting to enter the prison library. He alleges that defendant Barnett was Tudor's supervisor and that he was the author of Step I responses to plaintiff's two grievances regarding Ms. Tudor. Plaintiff claims that Barnett violated the same

_____

[1]Defendant Tudor retired in August 2007. (docket # 76, Ex. C, Tudor Aff. ¶ 2).

constitutional rights as Tudor, and that Tudor and Barnett conspired to deprive him of his federal constitutional rights.

Plaintiff's claims against Assistant Food Service Director Almy relate to the adequacy of the prison's food service during plaintiff's 2007 observance of Ramadan. He alleges that various actions by defendant Almy violated his rights under the First Amendment's Free Exercise and Establishment Clauses, the Fourteenth Amendment's Due Process and Equal Protection Clauses, and his statutory rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA). Plaintiff alleges that the Warden's Administrative Assistant, Delores Crosby, failed to respond to his September 11 and 12, 2007 letters. He claims that Crosby's actions violated the same constitutional and statutory rights as defendant Almy. He asks that the court, in its discretion, exercise supplemental jurisdiction over state-law claims against all defendants. He seeks an award of monetary damages and declaratory and injunctive relief against defendants in their individual capacities[2].

The matter is now before the court on defendants' motions for summary judgment. (docket #'s 49, 75). Plaintiff filed briefs in opposition to defendants' motions (docket #'s 56-57, 79), and the motions are ready for decision. For the reasons stated herein, I recommend that defendants' motions for summary judgment be granted. I further recommend that the court, in its discretion, decline to exercise supplemental jurisdiction. An order implementing these recommendations should be entered. I further recommend that the court enter a separate and final judgment in favor of defendants on all plaintiff's federal claims.

---

[2]On June 16, 2008, the court entered an order dismissing with prejudice all plaintiff's claims asserting violations of his Eighth Amendment rights and all claims against defendants in their official capacities. (6/16/08 Order, docket # 44).

## Applicable Standards

### A. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Synbrandt v. Home Depot U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir. 2009). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see Cady v. Arenac County*, 574 F.3d 334, 339 (6th Cir. 2009). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Smith v. Williams-Ash*, 520 F.3d 596, 599 (6th Cir. 2008).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th

Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Reed v. International Union, United Aerospace & Agric. Implement Workers of Am.*, 569 F.3d 576, 579 (6th Cir. 2009).

Where, however, a moving party with the burden of proof seeks summary judgment, he faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). As shown above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and "'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" *Arnett*, 281 F.3d at 561 (quoting 11 James William Moore, et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000)); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier

of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).  This higher standard applies to the portion of defendant Tudor's motion for summary judgment based on 42 U.S.C. § 1997e(a) because lack of exhaustion is an affirmative defense.

### B. Standards Applicable to the Affirmative Defense of Failure to Exhaust Remedies

Defendant Tudor has asserted the affirmative defense of plaintiff's failure to exhaust administrative remedies.  A prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust available administrative remedies.  42 U.S.C. § 1997e(a); *see Jones v. Bock*, 549 U.S. 199, 220 (2007); *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731 (2001).  A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process.  *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 734.  In *Jones v. Bock*, the Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints."  549 U.S. at 216.  The burden is on defendant to show that plaintiff failed to properly exhaust his administrative remedies.  The Supreme Court reiterated that "no unexhausted claim may be considered."  549 U.S. at 220.  The Court held that when a prisoner complaint contains both exhausted and unexhausted claims, the lower courts should not dismiss the entire "mixed" complaint, but are required to dismiss the unexhausted claims and proceed to address only the exhausted claims.  549 U.S. at 219-24.

In order to exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law.  *Jones v. Bock*, 549 U.S. at 218-19.  In *Woodford v. Ngo*, 548 U.S. 81

(2006), the Supreme Court held that the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90; *see Scott v. Ambani*, 577 F.3d 642, 674 (6th Cir. 2009); *see also Vandiver v. Correctional Med. Servs.*, 326 F. App'x 885, 888 (6th Cir. 2009). Thus, when a prisoner's grievance is rejected by the prison as untimely because it was not filed within the prescribed period, the prisoner's claim is not "properly exhausted" for purposes of filing a § 1983 action in federal court. *Id.* at 90-93; *see* 42 U.S.C. § 1997e(a).

MDOC Policy Directive 03.02.130 (effective March 5, 2007) sets forth the applicable grievance procedures.[3] Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶¶ P, V. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). Thus, where an individual is not named in the Step I grievance, or his or her involvement in the issue being grieved is not indicated, or the individual is mentioned for the first time during an appeal of a denial of a grievance, the claims against that individual are not properly exhausted. *See Ketzner v. Williams*, No. 4:06-cv-73, 2008 WL 4534020,

---

[3]The MDOC amended this policy directive in July of 2007. The relevant portions of the policy are consistent in both 2007 versions. *See McMurry v. Caruso*, No. 1:07-cv-716, 2008 WL 5422853, at * 3 n.1 (W.D. Mich. Dec. 30, 2008).

at * 16 (W.D. Mich. Sept. 30, 2008)(collecting cases); *accord Sullivan v. Kasajaru*, 316 F. App'x 469, 470 (6th Cir. 2009).

The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. P.D. 03.02.130 at ¶ V. If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. The respondent at Step II is designated by the policy. The Step II respondent is generally the warden. *Id.* at ¶ DD. If the inmate is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the Step III respondent. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ S. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing ...." *Id.*

Ordinarily, a prisoner must pursue appeals of his grievance through Step III of the administrative process. An argument that it would have been futile to file a grievance does not suffice. Assertions of futility do not excuse plaintiff from the exhaustion requirement. *See Hartsfield v. Vidor*, 199 F.3d 305, 309 (6th Cir.1999) ("[A]n inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations.");

*see also Booth v. Churner*, 532 U.S. at 741 n. 6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); *Jones v. Douglas*, 108 F. App'x 254, 256 (6th Cir. 2004).

### Proposed Findings of Fact

The following facts are beyond genuine issue.

**1. Library Access on June 4, 2007**

On June 4, 2007, plaintiff and other prisoners were waiting to enter MCF's law library. Assistant Librarian Tudor exited the library office and went to open the library's door. Some of the prisoners had formed a line. Tudor found that plaintiff was out of line, with no other prisoners behind him. Plaintiff was standing in the way and Tudor did not want to place herself in a vulnerable position surrounded by prisoners on both sides. Plaintiff admits that he refused to answer when Ms. Tudor asked him if he had been first in line. (Plf. Aff. ¶ 33, docket # 37). Tudor directed plaintiff to go to the back of the line. Plaintiff refused to comply with Tudor's instruction and remained immobile and mute. Tudor let the other prisoners enter before plaintiff, but she never refused plaintiff entry. (Tudor Aff. ¶¶ 5-7). Plaintiff states that he was near the door in the front of the line. He stepped back when he was instructed to do so, but he refused to move any further away from the door out of concern that other inmates might be able to enter the library before he did. (Plf. Aff. ¶ 31-32). Plaintiff states that because he entered last, he lost an opportunity "to acquire various law books and material." (*Id.*).

## 2.    Plaintiff's Conviction, Appeals, and Habeas Corpus Petition

An examination of the status of plaintiff's federal habeas corpus petition as of June 4, 2007, is necessary because plaintiff claims that the momentary delay he experienced in entering the prison library on that date violated his First Amendment right of access to courts by adversely impacting his ability to prepare his habeas corpus brief. Plaintiff was sentenced on October 14, 2003, in Wayne County Circuit Court as a habitual offender, fourth-felony offense, to 23 years and nine months-to-50 years' imprisonment following a jury verdict finding him guilty of armed robbery. On August 16, 2005, the Michigan Court of Appeals affirmed his conviction and sentence. *People v. Green*, Nos. 252045, 252505, 2005 WL 1959494 (Mich. Ct. App. Aug. 16, 2005). On December 27, 2005, the Michigan Supreme Court denied plaintiff's application for leave to appeal. *People v. Green*, 707 N.W.2d 197 (Mich. 2005). On December 4, 2006, plaintiff filed his federal habeas corpus petition in the United States District Court for the Eastern District of Michigan. *Green v. Harry*, No. 2:06-cv-15377 (E.D. Mich.). His December 2006 petition was accompanied by an 80-page brief and nearly a hundred pages of exhibits.[4] On June 18, 2007, two weeks after plaintiff's delayed entry into the prison library, respondent filed a motion to dismiss the habeas petition. On July 5, 2007, plaintiff filed his brief in response. On July 6, 2007, plaintiff filed "supplemental objections." On November 28, 2007, plaintiff filed a motion to "amend/correct" his habeas corpus petition. Plaintiff's four-page motion did not state the substance of any proposed amendment. On March 28, 2008, United States District Judge Lawrence P. Zatkoff denied plaintiff's motion for leave to amend without prejudice. In the same order, Judge Zatkoff denied respondent's motion to

---

[4]Plaintiff states in his affidavit that Tudor's action on June 4, 2007, "severely minimized" his ability to prepare his habeas corpus brief . . . ." (Plf. Aff. ¶ 37). This is patently false. Plaintiff filed his habeas corpus brief and petition six months <u>before</u> the June 2007 incident.

dismiss without prejudice because the respondent had not yet filed the Rule 5 materials. Rule 5 materials were filed on April 28, 2008 and January 22, 2009. On September 30, 2009, Judge Zatkoff found that Grounds II and VI of the habeas corpus petition were unexhausted and he dismissed the habeas corpus petition without prejudice.

### 3. Grievances against Defendant Tudor

#### a. Grievance No. MCF-07-05-00429-14A

On May 3, 2007, plaintiff drafted Grievance No. MCF-07-05-00429-14A. He claimed that MCF's Librarian, D. Amo, had told him that Assistant Librarian Tudor had denied him a prison library call-out on May 1, 2007, for personal reasons:

> The basis for this grievance is: Abuse of Discretion & Denial of access to the courts. On 4-30-07, Prisoner Rashad placed in the law-library box a request for call-out on 5-01-07. Prisoner never received a call-out on 5-01-07. Prisoner [R]ashad addressed these concerns with librarian D. Amo. He informed [R]ashad that [L]ibrarian Tudor had been denying the call-outs for personal reasons. On a previous occasion I spoke with Tudor concerning a misprint of the date at the top of the request form and was told that if the date was wrong I would not be placed on the call-out. The rule is if the request is dropped in the box, it would be for the next day. The Memorandum never gave notice of this procedure employed by [L]ibrarian Tudor. These actions are arbitrary and capricious, abuse of discretion and denied prisoner [R]ashad a right of access to the courts. PD-05.03.116; PD-01.04.110. RELIEF SOUGHT: Librarian Tudor be reprimanded and this procedure ceased. PD-02.03.100(A); PD-02.03.130.

(docket # 76, Ex. B).

On May 9, 2007, Librarian Amo wrote a memorandum to School Principal Michael Barnett advising that Amo had never told plaintiff that Ms. Tudor was denying prisoner call-outs for personal reasons. Plaintiff's call-out request had been received on May 1, 2007, and he had received his library call-out the next day, May 2, 2007, from 6:15 p.m. to 8:30 p.m. (docket # 76, Ex. B-1).

Barnett drafted the Step I response to plaintiff's grievance. Barnett found that plaintiff's grievance was frivolous:

> Per my investigation and per attached statement from David Amo, he did not tell Prisoner Rashad (Green) # 189440 that Ms. Tudor was denying his call-outs for personal reasons. In fact, see the attached call-out report, Prisoner Rashad received a call-out on 5/2/07 for 1815 to 2030. Prisoner Rashad lied in his grievance. In addition, he claims that if a call-out request is placed in a box, it should automatically be assumed it's for the next day. We have prisoners who do not need to attend the library the very next day. It's the prisoner's responsibility to indicate the "date" he wants to be placed on the call-out. His access to cou[r]t was not denied because he received a call-out for 5/2/07. In my opinion his grievance is frivolous and without merit.

(docket # 76, Ex. B). Plaintiff did not appeal the denial of this grievance. (docket # 76, Ex. D).

### b. Grievance No. MCF-07-06-563-17e

On June 11, 2007, plaintiff filed Grievance No. MCF-07-06-563-17e. (docket # 76, Ex. A). He complained that defendant Tudor prevented him from being the first prisoner into the library on June 4, 2007:

> The basis of this grievance is: <u>Retaliation and Racial Discrimination</u>. On 6-04-07 at 6:13 pm, prisoner Rashad # 189440 arrived at his law-library call-out and was standing outside the door, with another prisoner # 141756, awaiting for the door to be opened. Librarian Tudor stated, "I will not open the door unless you are standing behind the door." Prisoner Rashad stepped further behind the door and Tudor then became irate and stated, "were you in line first?" Due to Tudor's tone of voice, prisoner Rashad did not answer. Tudor then stepped closer towards prisoner Rashad's face and repeated the same question in a louder tone. By this time other prisoners had lined up for the library (total of six, all were white). Tudor, then looked around and noticed that her actions were drawing stares, which also includ[ed] LTA [O]fficer Coleman. Tudor then asked prisoner # 141756 was prisoner Rashad first in line. When he replied "Yes," Tudor became more irate due to this prisoner not agreeing with her and stated, "I was not talking to you." Tudor then opened the library door and informed all white prisoners that they could enter and stood blocking the path of prisoner Rashad preventing him from entering. Once the prisoners were all inside, Tudor again stepped within two feet of prisoner Rashad, while hold[ing] the door and stated, "now you may enter if you like." Tudor walked away inside the library and I remained at the end of the line which extended outside the door. While waiting several prisoner[]s, as well as, LTA [O]fficer Coleman had remarked to prisoner Rashad that he did the right thing under

-11-

[the] circumstances. It is prisoner Rashad's belief that Tudor's conduct [was] retaliatory, racially motivated, harassing and inhumane in violation of PD-03.02.130(J)[,] PD-02.03.109, PD-03.03.130(I)(6), PD-01.04.110(B), MCL 791.203.

Relief Requested: Prisoner Rashad seeks a thorough investigation into these allegations and that librarian Tudor be disciplined in accordance [with] PD-02.03.100 (Attachment-A).

(docket # 73, Ex. A).

Defendant Barnett was the author of the Step I grievance response. Barnett found no evidence that Ms. Tudor's sending plaintiff to the back of the line on June 4, 2007, had been racially motivated or retaliatory. Barnett reminded Tudor that under Policy Directive 03.03.130, prisoners were to be treated humanely and with dignity. Barnett stated that prison personnel issues would not be addressed in the grievance procedure format. (*Id.*). Plaintiff criticizes Barnett's Step I response as minimizing defendant Tudor's conduct. (docket # 36, ¶ 37; Plf. Aff. ¶ 43, docket # 37). Plaintiff pursued a Step II appeal. The warden's response stated that appropriate measures had been taken and that the grievance had been resolved. (docket # 73, Ex. A). Plaintiff's Step III appeal demanded that disciplinary action be taken against Tudor. His Step III appeal was denied on August 20, 2007. (*Id.*).

4.     MCF's Food Service from September 2007 through November 2007

Plaintiff states that he is an Orthodox Muslim. On September 10, 2007, plaintiff reviewed the prison's Ramadan menu. He then wrote two letters to Ms. Delores Crosby, the warden's administrative assistant, complaining that the prison's Ramadan meals were not being served hot and that plaintiff had not received adequate advance notice regarding Ramadan menu changes. (docket # 36, ¶ 65). Ms. Crosby did not respond to plaintiff's letters. (*Id.* at ¶ 66).

Plaintiff states that Assistant Food Service Director Ron Almy did not provide him with adequate advance notice of the "substitutions" in the Ramadan food items being offered:

68. On September 16, 2007, Ron Almy began to deprive Plaintiff of various food items (see menu's circled items), without [] provid[ing] any notice of substitutions or prior notice of Ramadan changes.

69. Plaintiff began making complaints to his food service supervisor Kim Sweed about the lack of food items missing from the menu, lack of substitutions and lack of fair notice, in which she stated, "all I can do is e-mail Almy about it."

70. It was an established policy at MCF to post prior notice of all main menu food item substitutions. This procedure was not provided for the Ramadan menu.

(Third Am. Compl., ¶¶ 68-70). A prison operating procedure stated that in an attempt to assist MCF's prisoners in observing any religious dietary restrictions that they might feel compelled to follow, the prison's "regular diet menu" would be posted a week in advance. (O.P. 05.03.155A, docket # 69, Ex. G).

Plaintiff states that a kosher diet is available to MCF's Jewish inmates and that as a Muslim prisoner he was not provided with a halal diet. (docket # 36, ¶¶ 60-64). There is no evidence that plaintiff made a request for the "development of a separate menu" in the manner specified in paragraph QQ of Policy Directive 05.03.150.

Plaintiff states, "During the month of Ramadan, Muslims are to be within a peaceful state of mind and do not suppose to engage in war, arguments or negative debates." (*Id.*, ¶ 82). He states that he found it more difficult to adhere to this belief and that his "peaceful aura" was disturbed during his 2007 Ramadan observance because he was involved in complaining to prison officials about cold meals and the lack of sufficient advance notice regarding substitutions. (*Id.*, ¶¶ 82-84).

**Discussion**

### I.     Claims Against School Principal Barnett

Plaintiff's claims against defendant Barnett are based on his Step I responses denying plaintiff's grievances against defendant Tudor.   This fails to state a claim of constitutional dimension.   *See Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir.2006).   A prisoner has no constitutional right to any effective grievance procedures or access to any such procedure voluntarily established by the state.   *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Argue v. Hofmeyer*, 80 F. App'x. 427, 430 (6th Cir. 2003); *Carpenter v. Wilkinson*, No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb.7, 2000); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994) (collecting cases).   Plaintiff's vague assertions of a "conspiracy" with defendant Tudor cannot survive defendants' motion for summary judgment.   *See Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807,  832 (6th Cir. 2007); *Gutierrez v. Lynch*, 826 F.2d 1534, 1358-39 (6th Cir. 1987).   Defendant Barnett is entitled to judgment in his favor as a matter of law on all plaintiff's federal claims.

### II.     Claims Against Administrative Assistant Crosby

Plaintiff's claims against defendant Crosby are based on her failure to respond to two letters from plaintiff regarding MCF's food service.   Plaintiff did not have a constitutional or statutorily protected right to a response to his correspondence.   *See Harris v. Westchester County Dep't of Corrections*, No. 06-Civ.-2011(RJS), 2008 WL 953616, at * 9 (S.D.N.Y. Apr. 3, 2008); *Hodge v. United States*, No. 03-cv-1622, 2007 WL 2571938, at * 13 (M.D. Pa. Aug. 31, 2007); *Fogle v. Pierson*, No. 05-cv-01-211-PSF-CBS, 2007 WL 274558, at * 9 (D. Colo. Jan. 29, 2007);

*Watson v. McGinnis*, 964 F. Supp. 127, 130 (S.D.N.Y. 1997) ("The law is clear that the allegations that an official ignored a prisoner's letter are insufficient to establish liability.") (collecting cases). Defendant Crosby is entitled to judgment in her favor as a matter of law.

### III.   Claims Against Assistant Librarian Tudor

#### A.   Exhaustion of Administrative Remedies

Defendant Tudor has raised the affirmative defense that plaintiff did not properly exhaust his administrative remedies against her as required by 42 U.S.C. § 1997e(a). Grievance No. MCF-07-05-00429-14A did not exhaust any claim. The grievance was denied at Step I because it was frivolous and plaintiff did not seek further review. Grievance No. MCF-07-06-563-17e exhausted plaintiff's First Amendment retaliation claim and his Equal Protection Clause claim against Tudor based on her June 4, 2007 decision to send plaintiff to the back of the line of the small group waiting to enter the prison law library. It did not properly exhaust plaintiff's First Amendment access to courts and conspiracy claims against defendant Tudor.

Assuming *arguendo* that plaintiff's access to courts and conspiracy claims had been properly exhausted, defendant Tudor would nonetheless be entitled to judgment in her favor as a matter of law. Plaintiff's vague and conclusory allegations of a conspiracy with defendant Barnett fail for the reasons previously stated. *See Center for Bio-ethical Reform*, 477 F.3d at 832; *Gutierrez*, 826 F.3d at 1358-59. Defendant Tudor is entitled to judgment in her favor as a matter of law on plaintiff's First Amendment access to courts claim. It is well established that prisoners have a constitutional right of access to the courts. *Bounds v. Smith*, 430 U.S. 817, 821 (1977); *Jackson v. Jamrog*, 411 F.3d 615, 619 (6th Cir. 2005). In order to state a viable claim for interference with his

access to the courts, a plaintiff must show "actual injury" in a specific case. *See Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999); *Talley-Bey v. Knebl*, 168 F.3d 884, 886 (6th Cir.1999). The actual injury requirement is not satisfied by just any type of frustrated legal claim. The actual injury must be connected to direct pursuit of a non-frivolous direct appeal from a criminal conviction, a habeas corpus petition or a civil rights action under 42 U.S.C. § 1983 to vindicate "basic constitutional rights." *Lewis*, 518 U.S. at 354; *see Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) ("'Depriving someone of a frivolous claim . . . deprives him of nothing at all, except perhaps the punishment of Federal Rule of Civil Procedure 11 sanctions.'") (quoting *Lewis v. Casey*, 518 U.S. at 353). Plaintiff did not suffer any "actual injury." His statement that he suffered prejudice in his habeas corpus lawsuit is patently false, as is shown in the proposed findings of fact.

B.   Retaliation Claim

On summary judgment, a plaintiff asserting a First Amendment retaliation claim must present evidentiary proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged in conduct protected by the First Amendment; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *see also Lustig v. Mondeau*, 211 F. App'x 364, 372 (6th Cir. 2006); *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 438 (6th Cir. 2006). The plaintiff has the burden of proof on all three elements. *See, e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003).

Plaintiff filed two grievances against Ms. Tudor. A prisoner's filing of a grievance can constitute protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000); *see also Scott v. Stone*, 254 F. App'x 469, 472 (6th Cir. 2007). Plaintiff's Grievance No. MCF-07-05-00429-14A was frivolous. It did not constitute protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000) (filing a frivolous grievance is not protected conduct); *accord Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008); *Ziegler v. Michigan*, 90 F. App'x 808, 810 (6th Cir. 2004). Plaintiff's other grievance against Ms. Tudor could not have been the motivation for allegedly retaliatory action occurring a week *before* the grievance was filed. Further, it is well established that "a prisoner is expected to endure more than the average citizen . . . ." *Hix v. Tennessee Dep't of Corr.*, 196 F. App'x 350, 358 (6th Cir. 2006). Disputes over where a line starts and who is the person at the front of it are commonplace. Sending plaintiff to the end of the short line of prisoners waiting to enter the prison law library is not an action that would deter a person of ordinary firmness from engaging in protected conduct. I find that defendant Tudor is entitled to judgment in her favor as a matter of law on plaintiff's retaliation claim.

C.     Equal Protection Claim

Defendant Tudor is entitled to judgment in her favor as a matter of law on plaintiff's equal-protection claim. The Equal Protection Clause of the Fourteenth Amendment states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; *see Michael v. Ghee*, 498 F.3d 372 (6th Cir. 2007). Plaintiff was required to present evidence demonstrating "'intentional and arbitrary discrimination' by the state; that is, he must demonstrate that he "[was] intentionally treated differently from others similarly situated and

that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Plaintiff falls far short of satisfying these requirements. Plaintiff refused to answer Ms. Tudor when he was asked whether he had been at the front of the line. Plaintiff did not present evidence that he was treated differently from other similarly situated prisoner. The assistant librarian certainly had a rational basis for sending plaintiff to the back of the line.

IV.     **Claims Against Assistant Food Service Director Almy**

Plaintiff alleges that in the fall of 2007, defendant Almy violated his federal rights under the First Amendment's Establishment and Free Exercise Clauses, the Fourteenth Amendment's Equal Protection and Due Process Clauses, and his statutory rights under RLUIPA by depriving him of hot Ramadan meals, not providing plaintiff with adequate advance notice of "substitutions," and "refusing to provide a halal diet." (Third Am. Compl., ¶¶ 85-90).

A.      <u>Due-Process Claim</u>

Plaintiff alleges that the food item substitutions made in his 2007 Ramadan meals[5] violated a prison operating procedure which called for "main menu" substitutions to be posted a week in advance. Ramadan meals were not main menu meals. Plaintiff did not have a protected liberty or property interest to a week's advance notice of menu item substitutions.[6] Meal plan

---

[5]Plaintiff did not submit evidence regarding specific 2007 Ramadan meals. His affidavit states that his September 6, 2008 meal was missing "tomato slices, mayo, mustard and lettuce" and his meal on September 7, 2008, lacked "tomato slices [and] fresh fruit." (Plf Aff. ¶¶ 4-11). On September 8, 2008, plaintiff notified MCF's chaplain that he wanted to be removed from the Ramadan meal list and that plaintiff would attempt to obtain his own Ramadan meals. (*Id.*, ¶ 11).

[6]Without a protected liberty interest, plaintiff cannot successfully claim that his due-process rights were violated because, "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

changes occur on a regular basis both inside and outside the prison context. Such changes are dependent on numerous variables, including, but not limited to, the food supplies available and the cost of those items. The absence of advance notice is not an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

### B.    Equal-Protection Claims

Plaintiff alleges that defendant Almy violated his rights under the Equal Protection Clause "by depriving Plaintiff of fair notice, hot meals, and adequate daily calories . . . ." (Third Am. Compl., ¶ 89). Further, he alleges that he did not receive a "Halal Diet" with meats "properly prepared (slaughtered in accordance with the Quran)." (*Id.*, ¶¶ 60-61, 90).

Plaintiff's claim that "substitutions" violated his Fourteenth Amendment rights under the Due Process Clause was addressed in the previous section. Plaintiff enjoyed no greater rights under the Fourteenth Amendment's Equal Protection Clause, and defendant Almy is entitled to judgment in his favor on this claim as a matter of law.

Plaintiff states that his meals contained "inadequate" calories. The Eighth Amendment's Cruel and Unusual Punishments Clause, applicable to the States through the Fourteenth Amendment's Due Process Clause, provides plaintiff's substantive guarantees with regard to caloric content of prison meals. *See Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987). In general, convicted criminals are not in a position to complain about the mere unpleasantry of prison meals. *Id.* ("Not every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment."); *accord Stapleton*

*v. Wilson*, No. 07-cv-218-KSF, 2007 WL 3120121, *6 (E.D. Ky. Oct. 23, 2007) ("The law is not favorable to inmates who complain about the quality of the food served to them.") (collecting cases). The food served "need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1455 (9th Cir. 1993). Even "food [that] occasionally contains foreign objects or is sometimes served cold, while unpleasant, does not amount to a constitutional deprivation." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985); *see Williams v. Berge*, 102 F. App'x 506, 507 (7th Cir. 2004); *accord Smith v. Younger*, No. 98-5482, 1999 WL 623355, at * 2 (6th Cir. Aug. 9, 1999); *George v. King*, 837 F.2d 705 (5th Cir. 1988) (dismissing as frivolous under 28 U.S.C. § 1915(d) prisoner's claim based on single incident of unintended food poisoning). The court dismissed plaintiff's Eighth Amendment claims with prejudice on June 16, 2008. (docket # 44).

Plaintiff alleges that the absence of "hot" Ramadan meals violated his rights under the Equal Protection Clause. He states that Muslims, with limited exceptions, are required to fast for "29-30" days during the their observance of Ramadan. (docket # 69, Plf. Aff. ¶ 15). "For the month of Ramadan, many devout Muslims fast during daylight hours." *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, at * 1 (6th Cir. July 30, 1997). Plaintiff did not present evidence that defendant Almy supplied the prisoners of other faiths with hot meals during non-daylight hours.

Plaintiff states that a kosher diet is available to Jewish inmates and that he was not provided with a halal diet. Four diets are available at MCF: main menu, vegetarian diet, kosher diet, and therapeutic diet. The MDOC has not authorized a halal diet. There is no evidence that plaintiff made a request to the "CFA or FOA Deputy Director or designee" under paragraph QQ of Policy Directive 05.03.150 for the "development of a separate menu necessary to meet necessary religious dietary restrictions of a prisoner." Defendant Almy, an assistant food service manager at MCF, was

not authorized under the MDOC's policy directive to develop a new diet, nor to determine whether the diet would be offered in Michigan's prisons. I find that defendant Almy is entitled to judgment in his favor as a matter of law on plaintiff's Equal Protection Clause claims.

### C. First Amendment Claims

"The Religion Clauses of the First Amendment provide: 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people. While the two Clauses express complementary values, they often exert conflicting pressures." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). "'[T]here is room for play in the joints between' the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause."[7] 544 U.S. at 713 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004)).

#### (1) Establishment Clause Claim

Plaintiff alleges that defendant Almy violated his rights under the First Amendment's Establishment Clause through "disparate treatment" of Muslim and Jewish inmates. (Third Am. Compl., ¶ 87). In *Cutter v. Wilkinson*, the Supreme Court stated, "'This Court has long recognized that the government may ... accommodate religious practices ... without violating the Establishment

---

[7]Although applicable originally only against the federal government, the Establishment Clause has been incorporated against the States by the Fourteenth Amendment. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947).

-21-

Clause." 544 U.S. at 713-14 (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144-145 (1987). "[T]he Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). There is no evidence that defendant Almy coerced plaintiff into participating in Jewish religious practices or took actions establishing a state religion. Defendant Almy is entitled to judgment in his favor as a matter of law on this claim.

### (2) Free Exercise Clause Claim

Plaintiff alleges that defendant Almy's actions violated his rights under the Free Exercise Clause "as a result of having to engage in complaining to prison officials regarding the denial of fair notice, hot meals, and inadequate nutritional calories, as set forth in the complaint." (Third Am. Compl., ¶ 86). A prisoner retains only those First Amendment freedoms which are "not inconsistent with his status as a prisoner or with legitimate penological objectives of the corrections system [ ]." *Martin v. Kelley*, 803 F.2d 236, 240 n.7 (6th Cir. 1986) (quoting *Procunier*, 417 U.S. at 822); *see Turner v. Safley*, 482 U.S. 78 (1987). Lawful incarceration legitimately requires the retraction or withdrawal of many rights and privileges as a necessary consequence of society's need to deter and punish crime.[8] *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). "The limitations

_____

[8]Initial issues presented in addressing a Free Exercise Clause claim are whether the plaintiff's beliefs are religious in nature and whether those religious beliefs are sincerely held. *United States v. Seeger*, 380 U.S. 163, 183-84 (1965). Only beliefs that are religious in nature are protected by the Free Exercise Clause. *See Thomas v. Review Bd. of the Indian Employment Sec. Div.*, 450 U.S. 707, 714 (1981); *Sherbert v. Verner*, 347 U.S. 398 (1963); *see also DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) ("The mere assertion of a religious belief [by a prisoner] does not automatically trigger First Amendment protections . . . only those beliefs which are both sincerely held and religious in nature are entitled to constitutional protection."). Without doubt, prison officials are entitled to

on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives -- including deterrence of crime, rehabilitation of prisoners, and institutional security." *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974). "The Supreme Court has held that in most circumstances, prison officials 'should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

In *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987), the Supreme Court held that the constitutionality of prison regulations that infringe upon a prisoner's rights under the First Amendment must be evaluated under the test of *Turner v. Safley*, 482 U.S. 78 (1987). The Supreme Court noted that it is well established that lawful incarceration legitimately requires restrictions on many rights and privileges as a necessary consequence of a criminal conviction. *O'Lone*, 482 U.S. at 348.

> [S]uch a standard is necessary 'if prison administrators . . ., and not the courts [are] to make the difficult judgments concerning institutional operations.' *Jones v. North Carolina Prisoner's Union*, 433 U.S. [119,] 128 [(1977)]. Subjecting day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby 'unnecessarily perpetuat[ing] the involvement of the federal

---

assure themselves of a prisoner's sincerity of religious belief as a prerequisite to their considering a request for an accommodation. *See Africa v. Pennsylvania*, 662 F.2d 1025, 103 (3d Cir. 1981). In the absence of such an inquiry, prisoners would be free to assert false religious claims that are actually attempts to gain special privileges or disrupt prison life. *See Ochs v. Thalacker*, 90 F.3d 293, 296 (8th Cir. 1996). Defendant Almy did not seek summary judgment on the grounds that plaintiff's beliefs are not religious in nature or that they are not sincerely held.

courts in the affairs of prison administration.' *Procunier v. Martinez*, 416 U.S. [396], 407 [(1974)].

*Turner*, 482 U.S. at 89. The familiar *Turner* factors are: (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) what impact that accommodation of the asserted constitutional right will have on other guards and inmates; and (4) whether there are other readily available alternatives at a *de minimis* cost to valid penological interests. *Turner*, 482 U.S. at 89-91. The *O'Lone* opinion closed with the statement, "We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to substitute our judgment on difficult and sensitive matters of institutional administration for the determinations of those charged with the formidable task of running a prison." 482 U.S. at 353 (internal citation omitted).

In this instance, there is a valid, rational connection between the prison regulation and the legitimate governmental interests put forth to justify it. *See Russell v. Wilkinson*, 79 F. App'x 175, 177 (6th Cir.2003). The legitimate governmental interests are security and budgetary interests. Prisons need not respond to particularized religious dietary requests to comply with the First Amendment. *See Kahey v. Jones*, 836 F.2d 948 (5th Cir. 1988). There is a legitimate governmental interest in running a simplified food service rather than a full-scale restaurant. *Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir.2007). Consequently, a prison may refuse in certain circumstances to provide religious-based diets, even where the prisoners are sincere in their requests. 486 F.3d at 122. Prison security is not only a legitimate governmental interest, it is recognized as a compelling governmental interest. *See Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir.2005); *Murphy v.*

*Missouri Dep't of Corr.*, 372 F.3d 979, 983 (8th Cir.2004) ("Institutional security is the most compelling governmental interest in a prison setting, and security is particularly important in dealing with group activities because of the potential for riots and the extensive damage resulting therefrom.").

In *Russell v. Wilkinson*, the Sixth Circuit rejected a similar claim by a Michigan prisoner objecting to a termination of his special diet under Policy Directive 05.03.150. Prisoner Russell alleged a violation of his First Amendment rights when he was denied kosher meals after prison officials determined that Russell had purchased non-kosher food from the inmate commissary. The Sixth Circuit held, "As the denial of kosher meals was based on Russell's obvious actions in not observing kosher food requirement outside meals, [defendant] had a legitimate penological interest in discontinuing Russell's request. That legitimate penological interest concerns the maintenance of prison discipline in the facility."[9] 79 F. App'x at 177. Here, plaintiff has not disputed that he retained alternative means for practicing his Muslim faith. The impact that accommodation of the asserted constitutional right would have on guards and inmates is obvious: it makes an already dangerous environment even more dangerous and imposes an unwarranted financial burden on the State of Michigan. There are no other readily available alternatives at a *de minimis* cost to valid penological interests. Defendant Almy's actions did not violate plaintiff's First Amendment rights under the Free Exercise Clause. *See Russell*, 79 F. App'x at 177; *see also Ketzner v. Williams*, No. 4:06-cv-73, 2008 WL 4534020, at *21-22 (W.D. Mich. Sept. 30, 2008).

_____

[9]In *Russell*, the Sixth Circuit held that a prisoner does not possess any protected liberty or property interest in participation in a kosher meal program, that discontinuation of the prisoner's participation in such a program was not an atypical or significant hardship in relation to the ordinary incidents of prison life, and that prison officials were entitled to summary judgment on the prisoner's procedural due process claims. 79 F. App'x at 178.

The State of Michigan expends significant financial and administrative resources in attempting to accommodate prisoners' religious beliefs by providing them with special diets that do not offend those religious beliefs. The State's resources are finite, and prisoner demands for specialized diets and food preparation are not. Michigan continues to struggle with the changing economy and billion dollar budget deficits. Among the recent extraordinary budget cuts by the State of Michigan are the lay-off of more than 100 state police troopers and the requirement that most state employees take unpaid furloughs. *See* Exec. Order No. 2009-22. The State of Texas recently found the financial and administrative demands posed by prisoner requests for special religiously-based diets to be overwhelming, and it declined to provide any special meals or the equipment necessary for preparing them in favor of simply providing pork-free and vegetarian alternatives to the regular food line. The Fifth Circuit, applying the *Turner* test, upheld the Texas policy.[10] *See Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir.2007). The court found that there was "a logical connection between the prison policy on inmate diet and the legitimate governmental interest in running a simplified prison food service rather than a full-scale restaurant." *Id.* Granting requests for specialized diets would be expensive, diverting resources from other penological goals. It would "place undue costs and administrative burdens on the prison system because of the likelihood of proliferation of such requests and the concomitant need to meet multiple distinct dietary requests."[11]

---

[10]The Fifth Circuit also upheld the policy against a RLUIPA challenge, finding the policy to be the least restrictive means of furthering compelling governmental interests. 486 F.3 d at 124-26.

[11]*See, e.g., Keesh v. Smith*, No. 9:04-cv-779, 2007 WL 2815641, at * 18 (N.D.N.Y. Sept.25, 2007) (prisoner Keesh purported to be a member of the "Tulakeesh" faith, asserting that his religious beliefs required him to have fixed diets of certain foods on certain dates, and that his food be prepared by a "Tulakeesh adherent").

*Id.* I find that defendant Almy is entitled to judgment in his favor as a matter of law on plaintiff's Free Exercise claims.

###### D. RLUIPA Claims

Plaintiff sued defendant Almy in his individual capacity for damages under RLUIPA.[12] The Sixth Circuit "has not yet ruled on whether RLUIPA authorizes suits for monetary damages against state officials in their individual capacities." *Heard v. Caruso*, Nos. 08-1170, 1179, 1180, 2009 WL 2628293, at * 10 n.5 (6th Cir. Aug. 27, 2009).

RLUIPA's section 3 provides that "[a] person may assert a violation of this chapter as a claim . . . in a judicial proceeding and obtain appropriate relief against a government."[13] 42 U.S.C. § 2000cc-2(a). The question presented is whether "appropriate relief" under this statute includes an action against a defendant in his individual capacity for damages. I find that RLUIPA, as an exercise of Congress' power under the Spending Clause, does not provide a cause of action for damages against defendant Almy in his individual capacity. He is not a recipient of federal funding and damages are not "appropriate relief." Every federal appellate court that has addressed the issue has held that RLUIPA, as an exercise of Congress' Spending Clause power, does not authorize a claim for damages against state employees in their individual capacities. *See Nelson v. Miller*, 570 F.3d 868, 877-79 (7th Cir. 2009); *Rendelman v. Rouse*, 569 F.3d 182, 187-89 (4th Cir. 2009);

---

[12]In *Cardinal v. Metrish*, 564 F.3d 794, 799-801 (6th Cir. 2009), the Sixth Circuit held that the Eleventh Amendment bars official capacity claims for damages under RLUIPA.

[13]The term "government" is defined in RLUIPA as: "(i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity listed in clause; and (iii) any other person acting under color of State law." 42 U.S.C. § 2000cc-5.

*Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 327-29 (5th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1274 (11th Cir. 2007); *accord Davis Next Friend LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 641 (1999); *National Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999). Defendant Almy is entitled to judgment in his favor as a matter of law on plaintiff's RLUIPA claims for damages against him in his individual capacity. Alternatively, for the reasons set forth herein, defendant Almy is entitled to qualified immunity on plaintiff's RLUIPA claims.

## V.    Qualified Immunity

Plaintiff seeks an award of damages against defendants in their individual capacities under RLUIPA and section 1983. Defendants' motions for summary judgment request entry of judgment in defendants' favor on the basis of, among other things, qualified immunity. "The purpose of the qualified immunity defense is to protect public officials from undue interference with their duties and from potentially disabling threats of liability." *Perez v. Oakland County*, 466 F. 3d 416, 426 (6th Cir. 2006). When a defendant raises the defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. *See Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009); *Hayes v. City of Circleville*, 474 F.3d 357, 362 (6th Cir. 2007).

In *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), the Supreme Court held that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see Everson v. Leis*, 556 F.3d 484, 493 (6th Cir. 2009). The question whether qualified immunity attaches to an official's actions is a purely

legal issue for the court. *See Everson*, 556 F.3d at 494; *Fox v. DeSoto*, 489 F.3d 227, 235 (6th Cir. 2007).

The Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001), endorsed a two-prong analysis for addressing qualified immunity issues. The first prong is whether the plaintiff has alleged and supported with evidence[14] facts showing that the defendant's conduct violated a constitutional or statutory right. *Saucier*, 533 U.S. at 201; *see Scott v. Harris*, 550 U.S. 372, 376 (2007); *Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007). The second prong of the qualified immunity inquiry is whether the right was "clearly established at the time of the defendant's alleged misconduct." *Saucier*, 533 U.S. at 201. Judges are permitted to exercise their "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009); *see Waeschle v. Dragovic*, 576 F.3d 539, 543 (6th Cir. 2009). Here, I find that the sequence endorsed by the Court in *Saucier* is appropriate. The first prong of the qualified immunity analysis was addressed in the preceding sections of this report and recommendation.

Assuming *arguendo* that plaintiff had been able to satisfy the initial requirement under *Saucier*, he would nonetheless fall short of showing that the right each claims a defendant

---

[14]A qualified immunity defense can be asserted at various stages of the litigation, including the summary judgment stage. *See English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994). The qualified immunity inquiry at the summary judgment stage is distinguished from the Rule 12(b)(6) stage in that generalized notice pleading no longer suffices, and the broader summary judgment record provides the framework within which the actions of each individual defendant must be evaluated. *See Riverdale Mills Corp. v. Pimpare*, 392 F.3d 55, 62 (1st Cir. 2004). At the summary judgment stage, a plaintiff may not rely on his pleadings. Rather, the issue is whether "the plaintiff has offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 905 (6th Cir. 2004); *see Merriweather v. Zamora*, 569 F.3d 307, 315 (6th Cir. 2009).

violated was "clearly established" such that a reasonable official in the defendant's position, at the time the act was committed, would have understood that his or her behavior violated that right. 533 U.S. at 201. "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 129 S. Ct. at 822. The Supreme Court's decision in *Brosseau v. Haugen*, 543 U.S. 194 (2004), examined the underlying purpose of requiring that the law be clearly established:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, misapprehends the law governing the circumstances she confronted. . . . Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at the time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

543 U.S. at 198. The Supreme Court and the Sixth Circuit have emphasized that the second inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. at 198 (quoting *Saucier*, 533 U.S. at 201); *see Silberstein v. City of Dayton*, 440 F.3d 306, 316 (6th Cir. 2006). "'[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense.'" *Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (quoting *Brosseau*, 543 U.S. at 199); s*ee Perez*, 466 F.3d at 428 ("Because most legal rights are clearly established at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had 'clearly violated.'"). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Nadar v. Blackwell*, 545 F.3d 459, 473 (6th Cir. 2008) ("[Q]ualified immunity applies unless *any officer* in the defendant's position would have clearly

understood that he was under an affirmative duty to have refrained from such conduct."). "Thus, '[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (quoting *Saucier*, 533 U.S. at 201). Although it is not always necessary to find a case where identical conduct had previously been determined to be unconstitutional,[15] in light of preexisting law, the unlawfulness must be apparent. *See Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003). If judges are in disagreement on an issue at the time the defendant acted, it is "unfair" to later subject the defendant to monetary damages "for picking the losing side in the controversy." *Pearson*, 129 S. Ct. at 823. "Ordinarily, a Supreme Court or Sixth Circuit decision on point is necessary." *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Jackson v. Schultz*, 429 F.3d 586, 592 (6th Cir. 2005). The court must focus on whether, at the time the defendant acted, the right asserted was "clearly established" by the decisions of the Supreme Court or the Sixth Circuit. *See Reynolds v. City of Anchorage*, 379 F.3d 358, 366 (6th Cir. 2004); *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002). "'[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate the law.'" *Armstrong*, 432 F.3d at 699 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Thus, officials are 'entitled to qualified immunity [when] their decision was reasonable, even if mistaken.'" *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)); *Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("Qualified immunity leaves government authorities 'ample room for mistaken judgments.'") (quoting *Scott v. Clay*

---

[15]"Of course, in an obvious case, [general constitutional] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199.

-31-

*County*, 205 F.3d 867, 873 n. 9 (6th Cir. 2000)). "If reasonable officials could disagree on the issue, immunity should be recognized." *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999); *see Akers*, 352 F.3d at 1042. "For qualified immunity to be surrendered, pre-existing law must dictate, that is truly compel (not just suggest or allow to raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in the circumstances." *Saylor v. Board of Educ.*, 118 F.3d 507, 514 (6th Cir. 1997); *see Gragg*, 289 F.3d at 964. "The burden of convincing a court that the law was clearly established 'rests squarely with the plaintiff.'" *Key*, 179 F.3d at 1000 (quoting *Cope v. Heltsley*, 128 F.3d 452, 459 (6th Cir. 1997)); *see Perez*, 466 F.3d at 427.

A.    Claims Against Defendants Crosby, Barnett, and Tudor

Plaintiff argues that defendants Crosby and Barnett are supervisors and are not entitled to qualified immunity because he made complaints regarding the actions of their subordinates. (Plf. Brief at 1, 4, 5, docket # 57). Liability of supervisory officers under 42 U.S.C. § 1983 cannot be based upon a *respondeat superior* theory. *See Skinner v. Govorchin*, 463 F.3d 518, 525 (6th Cir. 2006). Plaintiff has not shown that the actions of defendants Crosby, Barnett, or Tudor violated any clearly established federal rights.[16]

---

[16]Defendant Tudor did not seek summary judgment on plaintiff's retaliation claim based on the second prong of the qualified immunity analysis. *See Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) *(en banc)*. Her entitlement to qualified immunity on plaintiff's retaliation claim is limited to the first prong of the qualified immunity analysis. She is entitled to judgment in her favor based on all plaintiff's other claims based on the second prong of the qualified immunity analysis.

B.    Claims Against Defendant Almy

Plaintiff has not shown that the actions of defendant Almy violated any of his clearly established constitutional rights or his statutory rights under RLUIPA.  Almy's actions regarding plaintiff's food did not violate any clearly established federal right.  Serving prisoners cold meals during Ramadan does  not violate any clearly established right under the First Amendment's Free Exercise Clause.  *See Jaami v. Compton*, No. 98-5055, 1999 WL 455374, at * 1 (6th Cir. June 23, 1999) (affirming district court's dismissal of the prisoner's claim as frivolous); *see also Couch v. Jabe*, 479 F. Supp. 2d 569, 586 (W.D. Va. 2006) ("[I]nmates are not average citizens, but convicted criminals and, therefore, 'cannot expect the amenities, conveniences, and services of a good hotel.'") (quoting *Harris v. Flemming*, 839 F.3d 1232, 1235 (7th Cir. 1988)).  Plaintiff did not have any clearly established right to a Halal diet.  *See Thompson v. Williams*, 320 F. App'x 678, 679  (9th Cir. 2009) (defendants were entitled to qualified immunity on prisoner's RLUIPA and Free Exercise Clause Claims because he did not have a clearly established right to halal meals); *see also  Williams v. Morton*, 373 F.3d 212, 217-21 (3d Cir. 2003).  The availability of kosher meals did not violate plaintiff's clearly established rights under the Equal Protection Clause.  *See Abdullah v. Fard*, No. 97-3935, 1999 WL 98529 (6th Cir. Jan. 28, 1999); *see also Patel*, 515 F.3d at 815-16; *Williams v. Morton*, 373 F.3d at 221-22.

Defendant Almy's actions did not constitute a "substantial burden" on plaintiff's exercise of his Muslim faith and did not violate plaintiff's clearly established statutory rights under RLUIPA.  RLUIPA states:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title,

-33-

even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--

(1) is in furtherance of a compelling governmental interest;[17] and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C.A. § 2000cc-1(a). "The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion. The burden of proving the existence of a substantial burden rests on the religious adherent." *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007); *see Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 733 (6th Cir. Dec. 10, 2007), *cert. denied*, 128 S. Ct. 2903 (2008); *see also Dunlap v. Losey*, 40 F. App'x 41, 43 (6th Cir. 2002) ("RLUIPA . . . requires the complainant to show that his religious exercise was substantially burdened."). At the summary judgment stage, the plaintiff must present evidence of a substantial burden, and "unreasoned say-so" does not suffice. *See Gelford v. Frank*, 310 F. App'x 887, 889 (7th Cir. 2008).

RLUIPA does not define the phrase "substantial burden," and the Supreme Court "has not yet defined 'substantial burden' as it applies to RLUIPA." *Living Water*, 258 F. App'x at 733. In *Living Water*, the Sixth Circuit declined to establish a "bright line test" for determining a "substantial burden." *Id.* at 737. It held that the Supreme Court's Free Exercise jurisprudence provides the appropriate analytical framework. *Id.* at 733. The Sixth Circuit emphasized that in the Free Exercise context, the Supreme Court has made clear that the "'substantial burden' hurdle is

---

[17]"Context matters in the application of the compelling governmental interest standard." *Linehan v. Crosby*, No. 08-15780, 2009 WL 3042038, at * 1 (11th Cir. Sept. 29, 2009) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)). The standard should be applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." 544 U.S. at 723.

high." *Id.* "[A] 'substantial burden' is a difficult threshold to cross." *Id.* at 736. "'[A] substantial

burden must place more than an inconvenience on religious exercise.'" *Id.* at 739 (quoting *Midrash*

*Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)); *see Kinney v. Curtin*, No.

2:08-cv-58, 2009 WL 3052215, at * 10 (W.D. Mich. Sept. 21, 2009) (collecting cases). A

substantial burden is not established because the government's action makes the religious exercise

more difficult or expensive. *Living Water*, 258 F. App'x at 739; *see Patel v. United States Bureau*

*of Prisons*, 515 F.3d 807, 813-14 (8th Cir. 2008). Cold meal service did not violate any clearly

established rights under RLUIPA and was not a substantial burden. *See Patel v. United States*

*Bureau of Prisons*, 515 F.3d 807, 814-15 (8th Cir. 2008); *Couch v. Jabe*, 479 F. Supp. 2d at 585.

Plaintiff possesses alternative means of practicing his Muslim faith. No reasonable trier of fact could

find in plaintiff's favor on the "substantial burden" component of his RLUIPA claims against

defendant Almy.

Assuming *arguendo* that plaintiff had presented evidence on which a reasonable trier

of fact could find that defendant Almy's actions had resulted in a "substantial burden" on plaintiff's

exercise of Muslim faith, and further assuming that a RLUIPA claim for monetary damages against

defendant in his individual capacity is viable, defendant would nonetheless be entitled to judgment

in his favor as a matter of law on the basis of qualified immunity. The rights that plaintiff claims

under RLUIPA were not clearly established at the time defendant Almy acted in September and

October 2007. It is not sufficient for plaintiff to simply invoke the existence of the statute, because

under the second prong of the qualified immunity analysis, "the right the official is alleged to have

violated must have been 'clearly established' in a particularized, and hence more relevant sense."

*Lyons*, 466 F.3d at 428. "The U.S. Supreme Court has not yet defined 'substantial burden' as it

applies to RLUIPA. Neither does the statute itself contain any definition of the term." *Living Water*, 258 F. App'x at 733. The Sixth Circuit did not address the issue of what constitutes a "substantial burden" under RLUIPA until its unpublished December 10, 2007 decision in *Living Water*, 258 F. App'x at 737-41, and the Court of Appeals has provided little additional guidance since the *Living Water* decision regarding what constitutes a "substantial burden." *See Heard v. Caruso*, 2009 WL 2628293, at * 10; *Berryman v. Granholm*, No. 07-2081, 2009 WL 2461099, at * 3 (6th Cir. Aug. 12, 2009). The law regarding what constituted a "substantial burden" was not clearly established in 2007, when defendant Almy acted, and indeed, the law is not yet clearly established through the date of this report and recommendation. I find that defendant Almy is entitled to summary judgment on plaintiff's claims against him in his individual capacities for monetary damages on the alternative basis of qualified immunity.

## VI. Supplemental Jurisdiction

Plaintiff asks the court to exercise jurisdiction over purported state-law claims. "Supplemental jurisdiction is a doctrine of discretion, not of plaintiff's right." *Habich v. City of Dearborn*, 331 F.3d 524, 535 (6th Cir. 2003). Generally, where all federal claims have been dismissed, federal courts decline to exercise supplemental jurisdiction over a plaintiff's state-law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009). There is no reason in this case to depart from the general rule.

**Recommended Disposition**

For the foregoing reasons, I recommend that defendants' motions for summary judgment (docket #'s 49, 75) be granted, and that the court, in its discretion, decline to exercise supplemental jurisdiction over plaintiff's state-law claims. An order implementing these recommendations should be entered. I further recommend that a separate and final judgment be entered in defendants' favor on all plaintiff's federal claims.


Dated:  October 21, 2009              /s/  Joseph G. Scoville
                                                        United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).